Daniel A. Bernath, California Bar 116636

ussyorktowncvs10@yahoo.com

Mailing: 10335 sw Hoodview Drive

Tigard OR 97224

503 367 4204

Attorney for Plaintiffs and those similarly situated

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lily Jeung, Amy Sayers, and Darren Walchesky, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Yelp, Inc.<br><br>Defendant. | No. CV14-06223 FMO (ASX)<br><br>Opposition To Motion to Change Venue 28 USC§ 1404(a)<br><br>Date: December 11, 2014<br>Time: 10 a.m.<br>Place: 22-5th Floor<br>Judge: The Hon. Fernando M. Olguin |

**COMES NOW PLAINTIFFS IN OPPOSITION TO CHANGE VENUE** for the convenience of defendant CEO Jeremy Stoppelman:

1. All or nearly all **transactions, labors and occurances** took place in the Central District of California,

- 1 -
**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

1  2. All or nearly all **witnesses** are in the Central District of California and trial will be
2  convenient to all of the witnesses.  If venue is changed to San Francisco, witnesses may
3  not appear as they will have to lose income to take time off of work, hotel expenses of up
4  to $1,000, airplane fare of up to $400 or automobile travel of 8 hours from their homes
5  in Central District to Northern District and then return drive of 8 hours to their home in
6  Central District,

7  3. Plaintiffs did not contract nor consent to give up their **fundamental rights** to
8  defendant for a Fair Trial to waive venue from where nearly all transactions took place
9  and where nearly all witnesses reside.

10 *Daniel A. Bernath*
11 Daniel A. Bernath, Esq.
12 Attorney for Plaintiffs
13

**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA** - 2 -

## DECLARATION OF DANIEL A. BERNATH IN OPPOSITION TO CHANGE VENUE TO DISTANT NORTHERN CALIFORNIA DISTRICT

1. This is a collective action for wages pursuant to the FLSA.

2. While Yelp, Inc. Chief Executive Officer lives in San Francisco, venue has no bearing as to where the CEO wishes to have depositions or the trial.

## NEARLY ALL WITNESSES RESIDE IN CENTRAL DISTRICT OF CALIFORNIA

3. The plaintiffs are all writers of Yelp, Inc. Yelp, Inc. has the vast majority of plaintiff writers in the Central District of California.

4. Indeed, these writers/under Yelp's Right to Control all work under the direction of wage paid Writer Managers. Yelp has Writer Managers for East Los Angeles, Los Angeles, West Los Angeles, and Orange County.

5. But again, each of these Writer Managers is subject to and will likely have their depositions taken by Plaintiffs' counsel in the Central District of California where they all work and reside.

6. Yelp admits that it has 13 employees in the Central District. (MacBean Decl. ¶23.) It says that Yelp's employees in the Central district at the moment number 13. Yelp says they are perhaps salesmen but keep secret from the Court that they are actually wage-paid Writer Managers.

7. Taking Yelp's own figures in its motion; Yelp employed witnesses will therefore include all Yelp Writer Managers from 2004 to 2015 for these Central District witnesses for a rough total of 13 witnesses Yelp Central District Writer Managers times 11 years for a total potential deposition and trial witness count of **143 witnesses employed by now or in the past, relevant to the issues in this case, in the Central District of California**.

8. Plaintiffs reside in Los Angeles and Portland. One named plaintiff resides in Portland and Los Angeles but is domiciled in Los Angeles. The similarly situated plaintiffs are living and domiciled in the Central District and the vast portion of their work for Yelp was done in the Central District.

## YELP ADMITS; NEARLY ALL OCCURRENCES AND TRANSACTIONS OCCURRED IN THE CENTRAL DISTRICT AND FEW IN NORTHERN CALIFORNIA

9. Southern California is by far the depository of the deep well of labors. Transactions and occurrences done for Yelp as non-wage-paid writers and where the vast majority of these writers reside.

10. Yelp admits this by stating that the writing by these plaintiffs is four times more numerous in the Central District than in San Francisco.

11. Writes Yelp: [Yelp's Year in Review(s)](#)

Posted by [Andrea R, VP of Community Management](#)

While Bottega Louie topped the chart, they're in good company. Here's the full list of top …

most reviewed local businesses in 2013:

1. [Bottega Louie](#), **LOS ANGELES, CA**        8989 reviews
2. [Phil's BBQ](#), **San Diego, CA**        7901 reviews
3. [Bi-Rite Creamery](#), San Francisco, CA        7789 reviews
4. [Wurstküche](#), **LOS ANGELES, CA**        6272 reviews
5. [Pink's Hot Dogs](#), **LOS ANGELES, CA**        5855 reviews

1         **<u>Southern California</u> 29,017 reviews FOUR TIMES MORE PLAINTIFFS**

2   **THAN**     <u>San Francisco</u>     7,789 reviews

3   12. The Central District is the second largest metro area in the country and the

4       largest area of Yelp, Inc. labors in the country.

5   13. The first largest metro area, New York, has far fewer Yelp Writer Managers and

6       labors done by non wage paid writers.  Yelp, Inc. entered the New York market

7       relatively late but has been doing business within the Central District for nearly 11

8       years  The Central District is thus the mother-lode of Yelp laborers, witnesses and

9       "occurrences".

### WITNESSES AS TO THE KEY POINT OF "RIGHT TO CONTROL" RESIDE IN CENTRAL DISTRICT

12   11. The wage-paid managers of Yelp have the Right to Control (and do control) the

13       non-wage-paid laborers of Yelp.  These witnesses, the managers and the laborers

14       of Yelp, Inc., all are located within the Central District.

15   **12.** <u>Mariyam M.</u> Doe, Los Angeles, CA has stated that <u>her Los Angeles Yelp Writer Manager</u>

16       <u>ordered  her</u> to write 5 star reports on certain restaurants.  Mariyam M is merely one of

17       many witnesses who will have their depositions taken at their home turf in the Central

18       District.

19         o  I was excited to be part of the Elite squad because I thought it meant Yelp

20            appreciates me for all the things you listed; a, b, c and d. But now I am

21            unexcited because it seems to me like they are not promoting their own

| | |
|---|---|
| 1 | motto of 'real people, real reviews' when **they pressure elites about** |
| 2 | **the reviews written for an event."** |
| 3 | 13. This witness to be called at trial lives in Los Angeles and has personal knowledge |
| 4 | of Yelp's Right to Control its writers. |
| 5 | 14. Other witnesses in far from the distant Northern District also have knowledge of |
| 6 | Yelp's Right to Control in this regard: |
| 7 | **"yes. That's a requirement."**  Kelly K.  **Anaheim, CA** |
| 8 | 14. I will also take the deposition and call to the witness stand a reluctant witness |
| 9 | who admits her Yelp Inc., two-star review (in which she says the restaurant |
| 10 | "sucks") wasn't really because she hated the restaurant – in fact, she thinks they |
| 11 | have "a great thing going" – but because in order to keep her "elite" status, she |
| 12 | must write reviews with every level of Yelp ratings. This directly conflicts with |
| 13 | Yelp's assurance to the SEC that it doesn't tell its reviewers how to rate |
| 14 | businesses and shows Yelp's Right to Control of these plaintiff writers. |
| 15 | **15.** This key witness (listing herself as "Sunny 'Sunshine'" L. in Los Angeles, CA) lives |
| 16 | in Rowland heights, California, the Central District and will likely not appear |
| 17 | unless a subpoena is served upon her.  She surely is very unlikely to appear at |
| 18 | trial if she has to stop working and travel to San Francisco to testify against the |
| 19 | company that has treated her with honors (instead of earned wages). |
| 20 | 15. **Yelp's Right to Control even as to life or death decisions of its non-** |
| 21 | **wage-paid laborers**: As stated in paragraph 7 of the complaint, Yelp refused to |
| 22 | summon medical help for an unconscious, likely under-age, Yelp non-wage-paid |
| 23 | writer, thus exercising life or death control over plaintiff.  The Community |

- 6 -
**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

1     Manager who made this dangerous decision, plus the victim of Yelp's control of

2     the victim, plus the witnesses to this potential deadly event are all located with

3     the Central District of California.

4  16. Furthermore, the only two witnesses which Plaintiffs intend to take depositions

5     and call to the witness stand in trial are the CEO Stoppelman and another officer

6     of Yelp.  According to SEC[1] filings, these two officers have made multi millions of

7     dollars off of stock this year in sales of Yelp,Inc. in stock and thus it is no burden

8     for them to appear in the Central District for trial.  Plaintiffs' counsel will gladly

9     take their depositions in San Francisco.

10 17. The balance therefore is more than **143 witnesses** potentially for deposition

11     and trial in the Central District and two with the means to travel, living in San

12     Francisco.

13                    **WAGE PAID SALESMEN IN SAN FRANCISCO**

14                           **ARE NOT PART OF THIS CLASS OF**

15                               **NON-WAGE PAID WRITERS**

16

17 **18.** Defendants are being economical in disclosing the truth when they state that they

18     have many employees living in San Francisco and none or few living in the

19     Central District.   According to Yelp's SEC[2] filing, these employees are actually

---

[1] Yelp CEO Jeremy Stoppelman made **$8,493,479** from sales of company stock earlier this year. http://**www.secform4.com**/insider-trading/1541476.htm

[2] Yelp SEC S-1

| Costs and expenses: | | | | | |
|---|---|---|---|---|---|
| Cost of revenue (exclusive of depreciation and amortization shown separately below) | 608 | 1,121 | 3,137 | 2,168 | 4,098,000 |
| **SALES AND MARKETING** | **10,039** | **17,979** | **33,919** | **24,069** | **38,515,000** |
| Product development | 2,047 | 3,243 | 6,560 | 4,651 | 8,424,000 |
| General and administrative | 5,113 | 4,597 | 11,287 | 8,575 | 11,967,000 |

1 boiler-room type salesmen, supervisors and sales support of about 1,200, <u>who</u>
2 <u>have nothing to do with this litigation</u>. (SEC filing showing Yelp's expenses are
3 largely paying wage paid employees who are NOT part of this action.)
4 **19.** It is thus irrelevant to the issue of venue, therefore, that Yelp has hundreds of
5 sales employees who will not be called as witnesses in San Francisco and
6 approximately 143 Writer Managers and scores of non wage paid Yelp laborers
7 under their control in the Central District.
8 **20.** Yelp is less than totally open about the ability to produce evidence for trial.
9 The very detailed declaration of Yelp's Mr. MacBean reveals how swiftly and
10 easily Yelp can produce records anywhere as the Servers can be accessed from
11 any location in the world.
12 **21.** Furthermore, Yelp says that this action should be transferred to the Northern
13 District because Yelp's "**primary** servers" are in San Francisco. (Motion P 11,
14 L17) but Yelp actually operates out of secondary servers that are NOT in San
15 Francisco. Again, Yelp is being economical with the truth before this Court.
16 **22.** Yelp admits that it has only merely one server in San Francisco, but "**one**
17 of the facilities we lease to house our computer and telecommunications
18 equipment are located in the San Francisco Bay Area." "deploying **an additional**
19 <u>**location**</u> within a shared data center environment **in Virginia.**" SEC 1 Yelp
20 http://www.**sec.gov**/Archives/edgar/data/1345016/000119312511315562/d245328ds1.htm
21 **23.** Where the Primary servers are is of no moment as the declaration of Yelp's
22 data packed declaration of MacBean reveals. Any data which is stored on merely

| | | | | | |
|---|---|---|---|---|---|
| Depreciation and amortization | 571 | 1,201 | 2,334 | 1,483 | 2,790,000 |
| Total costs and expenses | 18,378 | 28,141 | 57,237 | 40,946 | 65,794 |

http://**www.sec.gov**/Archives/edgar/data/1345016/000119312511315562/d245328ds1.htm

- 8 -
**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

one of Yelp's servers (the primary in San Francisco but the others elsewhere) can be accessed anywhere, even inside the Courtroom in Los Angeles.

**24.** Yelp thinks that this Court is ill-informed as to how data is stored and transmitted by making the disingenuous statements on Page 11, L 16-22)

**25.** This is an action to recover wages for writers of Yelp, Inc. and again, the Central District is the mother-lode of plaintiffs, witnesses and "occurrences." San Francisco and the Northern District is but a minor outpost to this litigation.

26. Defendant Yelp, Inc. has hired competent counsel in Pasadena who has filed voluminous pleadings already and therefore Yelp is well protected in this Court in the Central District.

27. Yelp has stated that they will call some Yelp employees regarding the founding of the company and the policies developed by Yelp to bypass the protections to its workers of the FLSA.  The history of Yelp is not at issue and not an element of this FLSA lawsuit.  It is therefore not relevant to Yelp's motion to change venue and Yelp's goal to gain an unfair advantage by many  distant witnesses will not appear and costing the typical wage earned the enormous expense of traveling, missing work and having to book hotel rooms for multiple days in San Francisco.

28. Indeed, Yelp's declarant uses prevaricating words regarding the witnesses that Yelp may call stating that they "might" call them.  "Both of these individuals…are also based in San Francisco and **may potentially have relevant information regarding the issues in this case."**  Motion by Yelp, P 10 ¶ 25-27.

29. In contrast, the scores of witnesses in the Central District are central to this litigation, as are the occurrences in the Central District and shall be called as witnesses[3].

## THE SO CALLED "TERMS OF SERVICE" ARE NOT A BINDING CONTRACT ON NAMED PLAINTIFFS OR THOSE SIMILARLY SITUATED

30. Yelp makes much of a so called "Terms of Service.
    a. Defendant provides no admissible evidence that Plaintiffs ever agreed to such Terms of Service,
    b. Plaintiffs are unsophisticated people, not lawyers. Yelp, Inc. engaged in every technique (small print, hidden documents, legal jargon) to take advantage to attempt bind Plaintiffs to an unconscionable agreement,
    c. Yelp's executive is not custodian of records and thus cannot testify as to these amorphous document and thus quoting a website is inadmissible hearsay,

---

[3] Yelp further prevaricates; Yelp also says that this simple FLSA litigation is a dragnet of "perhaps **millions** of individuals." (Motion of Yelp P.13 L 6-7) Of course, Defendant provides no facts of such a fantastic claim. Plaintiffs are merely those people who have been subject to Yelp's Right to Control and other factors of employment, estimated at **3,600 to 5,600** non-wage paid writers. As the complaint details, a relative few were subject to Yelp's Right to Control (such as being told to write more reviews, to not write about certain businesses, paid in merchandise, honors but not wages, being fired by Yelp, Inc., subject to direction and control of Yelp's wage paid "managers", etc).

1     d. As a matter of law such documents are not binding as Yelp admits that it
2        inserts in a little text stating "you agree to our terms of service" and thus,
3        even if defendant's declarant was speaking from personal knowledge (he
4        isn't), such TOS should not be enforced against "consumers", is
5        unconscionable and is not prominent so as to put Plaintiffs on Notice,
6     e. <u>Plaintiffs are not seeking their wages for "use" of Yelp's "website."</u> This
7        Terms of Service is irrelevant as it relates to using a web site.  Plaintiffs
8        herein are suing for their wages, for reading instructions from Yelp, for
9        planning their work based on Yelp's demands, for traveling to the location
10      demanded by Yelp, for acting as a news reporter, for writing a first draft,
11      review and revise and then transmitting their work to Yelp. None of this
12      has anything to do with "using" Yelp,
13     f. Yelp changes this so called "Terms of Service" Yelp hides the Term of
14        Service from 2004 (again not relating to wage claims pursuant to FLSA).
15        The evidence shows that Defendant started in 2004 with a trap to take
16        away Plaintiff rights to Due Process/Fair trial and then changed the TOS
17        again and again and again.  There is no evidence that Plaintiffs agreed to
18        or should be bound by even one of these Defendant lawyer prepared
19        documents against Plaintiff non-wage-paid laborers.
20     g. Defendants do not produce their seminal TAH trap to consumers which
21        states:
22        `Yelp! Terms of Service  October 15, 2004`
23
24        `By using the Yelp! Services (as defined below) which are owned`
25        `and operated by Yelp! Inc. ("Yelp!") and by accessing the Yelp!`

- 11 -
**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

```
                    Site located at http://www.yelp.com, and all linked pages owned
                    and operated by Yelp! (the "Yelp! Site"), you agree to be bound
                    by these Terms of Service (this "Agreement").

                    **Miscellaneous.** If there is any dispute about or involving the
                    Yelp! Site and/or the Yelp! Service, by using the Yelp! Site, you
                    agree that the dispute will be governed by the laws of the State
                    of California without regard to its conflict of law provisions.
                    You agree to personal jurisdiction by and venue in the state and
                    **federal courts of the State of California, City of San Francisco**.
                    No agency, partnership, joint venture, or employment is created
                    as a result of this Agreement and you do not have any authority
                    of any kind to bind Yelp! in any respect whatsoever.

              I HAVE READ THIS AGREEMENT AND AGREE TO ALL OF THE PROVISIONS CONTAINED
              ABOVE.   (Emphasis added.   No signatures of Plaintiffs nor those
              similarly situated in any document)
```

31. Of course the "Terms of Service" are nonsense.

    There is **no** such thing as "venue in the state and federal courts of the
    State of California, City of San Francisco,
    Defendant offers no proof but mere speculation that Plaintiffs are bound
    by this hidden-on-the-internet "Terms of Service." Plaintiffs have never
    "read" this "agreement" and never "agreed to all of the provisions
    contained above" nor any of the many versions Defendant produces.

32. Defendants also display a document relative to an entity entitled "elite." Again,
    there is no foundation that Plaintiffs have ever seen such a document and there is
    no foundation that Plaintiffs ever knowingly agreed to take away their rights to
    wages, personal injury, criminal acts against them, (e.g. "***all***" claims against

- 12 -
**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

1  Yelp) or that plaintiffs and those similarly situated were "elite".  Those similarly
2  situated are those who were subject to Yelp's Right to Control whether Yelp chose
3  to call them "volunteers", "community members" or "elite",

33. The so called "Terms of Service" is an unconscionable attempt by Yelp to cleverly take away the fundamental rights to a fair trial of unsophisticated consumer/writer Plaintiffs.  The goal of this "Terms of Service" is so that witnesses from the Central District will not appear at trial in distant San Francisco and also to run up the cost of prosecuting this litigation by demanding that far off venue.

34. The TOS also is unconscionable under California law, using small print, lodged in a hidden place on the vast internet against "consumers" and "unsophisticated" targets to release Yelp, Inc. from liability for **"all"** of its legal obligations or bad acts.

35. As there is no evidence of a "meeting of the minds" between this hidden TOS and Plaintiffs, these confusing, secretly, multiple ***amend-at- will*** documents does not bind this Court as the Court determines if Plaintiffs' Due Process rights are protected. Due Process requires that the trial be held where up to 95% of the witnesses are.

36. Indeed, Defendants continue over time to throw up one, after the other "Terms of Service" as it suits Defendants to wiggle out of liability as one lawsuit after the other is filed by various plaintiffs.  Will Defendant rush into Court on the day of the venue hearing with but another "Terms of Service"?

**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

1  37. As Defendants drafted these ambiguous hidden away documents, all ambiguity in
2  interpretations go against Defendant Yelp, Inc.   Cal.Civ.Code §1654; United
3  States v. Seckinger, 397 U.S. 203 (1970)

4

5  I declare under penalty of perjury that the foregoing is true and correct under that laws
6  of the United States and that I testify as to my own personal knowledge and that this
7  declaration was made at Ft Myers Florida on 11.12.2014

8

9  *Daniel A. Bernath*

10 Daniel A. Bernath, Esq.
11 Attorney for Plaintiffs

12 **MEMORANDUM OF LAW**

13 Venue is proper in this District pursuant to 28 U.S.C. § 139l (b)(2), because a substantial
14 part of the events giving rise to the claims asserted herein occurred in this judicial
15 district; 28 U.S.C. § 139l (c)(2), and (d)

16  Plaintiffs labored for Defendant in the Central District of California.  The vast majority
17 of witnesses are here in the Central District as are all plaintiffs similarly situated.
18 Plaintiffs have no need and will not call the "developers", "salesmen" and sales support
19 in San Francisco of which Yelp, Inc. is nearly entirely composed.  The writers who were
20 not compensated pursuant to FLSA are vastly aggregated in the Central District.

21

# AS THERE IS EVIDENCE OF MUTUAL ASSENT THE "TERMS OF SERVICE" DO NOT BIND PLAINTIFFS AND MACBEAN'S DECLARATION IS INADMISSIBLE HEARSAY

Defendant's declaration, Ian MacBean is not the custodian of records of the alleged documents presented. (Declaration of MacBean ¶ 8 L 2-8) He admits that some other entity holds records that may or may not be a purported contract with Plaintiffs. He provides no personal testimony. As such, his testimony must be disregarded as inadmissible hearsay. Rule 803(6)

**(6) *Records of a Regularly Conducted Activity.*** A record of an act, event, condition, opinion, or diagnosis if:

**(A)** the record was made at or near the time by — or from information transmitted by — someone with knowledge;

**(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

**(C)** making the record was a regular practice of that activity;

**(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

**(E)** ~~neither~~ the opponent does not show that the source of information ~~nor~~ or the method or circumstances of preparation indicate a lack of trustworthiness.

1   Defendants do not prove that Plaintiffs have Notice

2   Or assent to the multiple Terms of service

3   Against these unsophisticated laborer plaintiffs

4   To deny Plaintiffs their Constitutional right to a fair trial with the devise meant to hide

5   that they would do so is unconscionable. Defendant seeks to put the trial at a distant

6   location where Plaintiffs' witness may not appear and away from where approximately

7   75% of the transactions took place-the Central District of California.

8   As such, the enforcement of this hidden and ever changing "terms of service" on these

9   unsophisticated consumers/laborers is unconscionable and should not be enforced.

10  **CAL. CIV. CODE § 1670.5**

11  (a) If the court as a matter of law finds the contract or any clause of the contract

12  to have been unconscionable at the time it was made the court may refuse to

13  enforce the contract, or it may enforce the remainder of the contract without the

14  unconscionable clause, or it may so limit the application of any unconscionable

15  clause as to avoid any unconscionable result.

16  (b) When it is claimed or appears to the court that the contract or any clause

17  thereof may be unconscionable the parties shall be afforded a reasonable

18  opportunity to present evidence as to its commercial setting, purpose, and effect

19  to aid the court in making the determination.

Arntz Builders v. Superior Court , 122 Cal. App. 4th 1195 (2004) (provision was void in construction contract between builder and County that waived the right to fair trial and benefits of Cal. Code Civ. Proc. § 394, which provided for change of venue to a "neutral county" in action by County against non-resident

*General Acceptance Corp. v. Robinson,* 207 Cal. 285, 289 (1929).

> The rules to determine in what courts and counties actions may be brought are fixed upon consideration of general convenience and expediency by general law; to allow them to be changed by the agreement of the parties would disturb the symmetry of the law, and interfere with such convenience. Such contracts might be induced by considerations tending to bring the administration of justice into disrepute." …. the agreement between the parties to the contract upon which this action was brought was void…

The Courts of Appeal that follow the holding in *General Acceptance*: *Alexander v. Superior Court,* 114 Cal.App.4th 723 (2003) "In this mandate action we are asked to decide whether a contractual venue selection clause is dispositive of the proper venue for an action on the contract. We conclude that to the extent the clause is inconsistent with the statutory venue scheme it is invalid.

 The concern with selecting venue is that parties will disrupt the statutory scheme and bring the administration of justice into disrepute in order **to have their cause heard where they believe it will be received most sympathetically**. But it is not for the parties or the courts to set venue. That is the role of the Legislature. (See *Caminetti v. Superior Court* (1941) 16 Cal.2d 838, 843 [108 P.2d 911].) emphasis added

**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

1  *Arntz Builders v. Superior Court*, 122 Cal. App. 4th 1195 (2004)

2  Ngyen v. Barnes and Noble 9th Cir. 2014

3  http://cdn.ca9.uscourts.gov/datastore/opinions/2014/08/18/12-56628.pdf

4  "While new commerce on the Internet has exposed courts to many new situations, it has

5  not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.,*

6  356 F.3d 393, 403 (2d Cir.2004). One such principle is the requirement that "[m]utual

7  manifestation of assent, whether by written or spoken word or by conduct, is the

8  touchstone of contract." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 29 (2d

9  Cir.2002) (applying California law).

10  the onus must be on website owners to put users on notice of the terms to which they

11  wish to bind consumers.

12  Courts "tend to shy away from enforcing browse wraparound agreements that require

13  no outward manifestation of assent"; Lemley, 91Minn. L. Rev. at 472–77 "An

14  examination of the cases that have considered browse wraps in the last five years

15  demonstrates that the courts have been willing to enforce terms of use against

16  corporations, but have not been willing to do so against individuals."). A consumer,

17  cannot be expected to ferret out hyperlinks to terms and conditions to which they have

18  no reason to suspect they will be bound in keeping with courts' traditional reluctance to

19  enforce browser wrap agreements against individual consumers, see Woodrow

20  Hartzog,Website Designas Contract, 60Am. U. L.Rev. 1635, 1644(2011) "An examination

21  of thecases that have considered browse wraps in the last five years demonstrates that

22  the courts have been willing to enforce terms of use against corporations, but have not

**OPPOSITION TO CHANGE VENUE TO NORTHERN CALIFORNIA**

1 been willing to do so against individuals.") if a court finds that a contract or any clause

2 in a contract is unconscionable, the court may limit the application of the

3 unconscionable clause, exclude the unconscionable clause from the contract, or refuse to

4 enforce the contract entirely if it is found to be unconscionable.

5

6 *Daniel A. Bernath*

7 Daniel A. Bernath, Esq.
8 Attorney for Plaintiffs

9